# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 3, 2020

No. 19-50765

Lyle W. Cayce
Clerk

In the Matter of: Buffets, L.L.C., doing business as Old Country Buffet, doing business as JJ North's Grand Buffet, doing business as Country Buffet, doing business as Home Town Buffet, doing business as Ryan's, doing business as Ryan's Family Steakhouse, doing business as Fire Mountain, doing business as Granny's, doing business as Tahoe Joe's, doing business as Tahoe Joe's Famous Steakhouse, doing business as Roadhouse Grill, doing business as Buffets, Incorporated, doing business as Ovation Brands, doing business as Soup 'N Salad Unlimited; Ocb Restaurant Company, L.L.C.; Fire Mountain Restaurants, L.L.C.; Tahoe Joe's, Incorporated; Ocb Purchasing Company; Hometown Buffett, Incorporated; Ryan's Restaurant Group, L.L.C.,

*Debtors*,

Henry G. Hobbs, Jr.,

*Appellant Cross—Appellee*,

*versus*

Buffets, L.L.C., doing business as Old Country Buffet, doing business as Country Buffet, doing business as Home Town Buffet, doing business as Ryan's, doing business as Ryan's Family Steakhouse, doing business as

No. 19-50765

Fire Mountain, doing business as Granny's, doing business as Tahoe Joe's, doing business as Tahoe Joe's Famous Steakhouse, doing business as Roadhouse Grill, doing business as JJ North's Grand Buffet, doing business as Buffets, Inc., doing business as Ovation Brands, doing business as Soup 'N Salad Unlimited; Hometown Buffet, Incorporated; Ocb Restaurant Company, L.L.C.; Ocb Purchasing Company; Ryan's Restaurant Group, L.L.C.; Fire Mountain Restaurants, L.L.C.; Tahoe Joe's, Incorporated,

*Appellees Cross-Appellants*.

---

Appeal from the United States Bankruptcy Court
for the Western District of Texas
USBC No. 5:16-BK-50557

---

Before Stewart, Clement, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

Filing fees help fund the federal judiciary. It costs $400 to file a lawsuit in federal district court; an appeal costs $505. *See Schedule of Fees*, U.S. Dist. & Bankr. Court: S. Dist. of Tex., https://www.txs.uscourts.gov/page/FeeSchedule; *see also* 28 U.S.C. §§ 1913, 1914. Bankruptcy court can be more expensive. Chapter 11 debtors pay not only a filing fee of $1717 but also quarterly fees until the bankruptcy ends. *Id.*; *see also* 28 U.S.C. § 1930(a)(6). A 2017 law imposed a temporary but substantial increase in those quarterly fees for large Chapter 11 debtors. The fee increase is an attempt to shore up the United States Trustee Program, so it went into immediate effect only in the eighty-eight judicial districts that use trustees. It took nine months for a similar fee adjustment to apply in the other six judicial districts.

2

No. 19-50765

Debtors nationwide have challenged the increased fees on numerous grounds, including a claim that delayed implementation in the non-Trustee districts means the fee amendment did not "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl.4.  Bankruptcy courts have disagreed on the constitutionality of the fee increase, with a majority allowing it.  We conclude that the fee increase is constitutional and applies in this case.

## I.

## A.

Bankruptcy courts fall into two categories: those that are part of the United States Trustee Program and those that use Bankruptcy Administrators.  Congress created this dual system in 1978 when it launched a trustee pilot program within the Department of Justice.  Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549, 2662–65 (1978).  Until then, bankruptcy judges had shouldered many "administrative functions" on top of their substantive work.  Trustees absorbed those administrative duties and began "serv[ing] as bankruptcy watch-dogs."  H.R. REP. NO. 95-595, at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049.  The program was a success, so Congress made it permanent in 1986.  Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, 100 Stat. 3088, 3090–95 (1986).

But not for every district.  Eighty-eight judicial districts participate in the Trustee Program.  *See In re Clinton Nurseries, Inc.*, 608 B.R. 96, 108–09 (Bankr. D. Conn. 2019).  The six districts in Alabama and North Carolina fall

No. 19-50765

under the Bankruptcy Administrator program, which the Judicial Conference oversees.[1] *Id.*

The programs have different funding sources. The judiciary's general budget funds the Administrators. *See In re Clayton Gen., Inc.*, 2020 Bankr. LEXIS 842, at *23–24 (Bankr. N.D. Ga. Mar. 30, 2020). But debtors primarily fund the Trustee Program. *Id.* Although annual appropriations technically bankroll the program, Congress expected that debtor fees would fully offset the cost. *See* Consolidated Appropriations Act of 2019, Pub. L. No. 116-6, div. C., tit. II, 133 Stat. 13, 103–04 (2019). Such debtor-paid fees include Chapter 11 quarterly fees. 28 U.S.C. § 1930(a)(6); *see also id.* § 589a(b)(5). The fees are based on all quarterly "disbursements" that debtors make until their cases are "converted or dismissed."[2] *Id.* § 1930(a)(6).

At first, debtors in Administrator districts were not required to pay quarterly fees. The Ninth Circuit held that to be unconstitutional, reasoning that Congress' imposition of fees in some districts but not others—without justification—violated the Bankruptcy Clause. *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1529, 1531–32 (9th Cir. 1994), *amended by* 46 F.3d 969 (9th Cir. 1995).

Congress fixed that problem with a law empowering the Judicial Conference to set fees in Administrator districts that were "equal to those imposed" in Trustee districts. 28 U.S.C. § 1930(a)(7). Those fees go to a fund offsetting general judicial branch appropriations rather than the U.S.

---

[1] It was originally thought that the exclusion of Alabama and North Carolina would last only a few years, but a later law enshrined their special status. *See* Federal Courts Improvement Act of 2000, Pub. L. No. 106-518, § 501, 114 Stat. 2410, 2421–22 (2000).

[2] The statute charges quarterly fees on a sliding scale based on debtors' quarterly disbursements. *See id.* § 1930(a)(6).

No. 19-50765

Trustee System Fund. *Id.* (citing *id.* § 1931). The Judicial Conference soon exercised the authority Congress gave it, charging quarterly fees in Administrator districts "in the amounts specified in 28 U.S.C. § 1930, as those amounts may be amended from time to time." JUDICIAL CONFERENCE OF THE U.S., REPORT OF THE PROCEEDINGS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES: SEPT./OCT. 2001, at 45–46 (2001), https://www.uscourts.gov/sites/default/files/2001-09_0.pdf.

All was well with the two systems until just a few years ago. By the mid-2010s, a decline in bankruptcy filings meant the Trustee Program was no longer self-sustaining. H.R. REP. NO. 115-130, at 7 (2017), *reprinted in* 2017 U.S.C.C.A.N. 154, 159. Congress attempted to remedy the shortfall in the Bankruptcy Judgeship Act of 2017 (a law we will call the "2017 Amendment"). Pub. L. No. 115-72, 131 Stat. 1224, 1229–34 (2017). The law amended section 1930(a)(6) to increase the possible quarterly fees in Chapter 11 cases.[3] *Id.* § 1004, 131 Stat. at 1232. The increase is temporary; it only applies during the five fiscal years from 2018 through 2022. The increase is conditional; it kicks in only if the Trustee System Fund's balance was less than $200 million "as of September 30 of the most recent full fiscal year." *Id.* And the increase is only for debtors with disbursements of $1 million or more in a quarter. *Id.* If all of those criteria apply, the quarterly fee is "the lesser of 1 percent of such disbursements or $250,000." *Id.* The new potential fee is a substantial increase from the old maximum fee of $30,000.

---

[3] The Act also said that 98% of section 1930(a)(6) fees collected between fiscal years 2018 and 2022 would be deposited to the U.S. Trustee System Fund, while the other 2% would go to the Treasury's general fund to help pay for the new temporary judgeships. *Id.*; *see also* H.R. REP. NO. 115-130, at 7–8.

5

*See* 28 U.S.C. § 1930(a)(6) (2008) (charging a $30,000 fee for quarterly disbursements exceeding $30 million).

Initially, only debtors in Trustee districts faced the fee increase. Many courts in Trustee districts applied the new fees to any quarterly disbursements that postdated the effective date of the 2017 Amendment, even if the bankruptcy case had been pending before the fee increase. In these courts, if a debtor disbursed $1 million or more starting in the first quarter of 2018, it owed the higher fees. But debtors in Administrator districts did not.

The Judicial Conference waited until September 2018 to adopt the increased fee schedule. JUDICIAL CONFERENCE OF THE U.S., REPORT OF THE PROCEEDINGS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES: SEPT. 13, 2018, at 11–12 (2018), https://www.uscourts.gov/sites/default/files/2018-09_proceedings.pdf. In doing so, it applied the new fees only to cases in Administrator districts "filed on or after October 1, 2018." *Id.* So a debtor in an Administrator district that filed for bankruptcy before the final quarter of 2018 does not owe the increased fees no matter how long the case remains pending.

## B.

That brings us to this case. Buffets, L.L.C. and its affiliates (collectively Buffets) operate buffet-style restaurants throughout the country. Old Country Buffet and Ryan's Family Steakhouse are examples. In 2016, after a series of misfortunes, Buffets filed a Chapter 11 petition in the Western District of Texas, which is a Trustee district. The bankruptcy court confirmed Buffets' plan in 2017. But the bankruptcies were still pending in 2018, after the new law went into effect.

In each of the first three quarters of 2018, Buffets reported over $1 million in total disbursements. Because the balance of the U.S. Trustee

No. 19-50765

System Fund was below $200 million, the Trustee assessed quarterly fees of $250,000.

Buffets refused to pay. Instead, it asked the bankruptcy court to include in "disbursements" only payments made under the plan—that is, payments to creditors, administrative expenses, etc. Buffets contended that its normal operating expenses—things like food and napkins—should not count as disbursements even though they were included on its quarterly schedule. That would have allowed Buffets to avoid the new fees as disbursements made "under the plan" were less than $1 million/quarter. The Trustee objected.

In response, Buffets claimed that classifying operating expenses as "disbursements" violated the Constitution's "Fundamental Fairness Clause" (if nothing else, a remarkably candid description as that characterizes the claims of many litigants who nonetheless try to dress their claims in a specific provision). The bankruptcy court denied the motion. Buffets moved for reconsideration. This time, it also challenged the constitutionality of the increased fees.

The bankruptcy court agreed with Buffets that the fee increase is unconstitutional for multiple reasons. It first held that the law violated the Constitution by increasing fees only in Trustee districts. The court thus concluded that the Amendment should apply only when the bankruptcy case, not the quarterly disbursement, was filed after the Administrator districts implemented the fee increase. The court then went a step further, concluding that the higher fees could never be applied to debtors like Buffets whose cases were pending before enactment of the 2017 Amendment because to do so would be an impermissibly retroactive imposition of "new duties and liabilities" on Buffets for "transactions already completed."

No. 19-50765

The Trustee appealed.  Buffets cross-appealed the "disbursements" ruling, pressing its argument that it did not meet the dollar threshold for the new fee.   The district court certified questions about the new law's applicability and constitutionality to our court.  We agreed to hear an appeal that bypasses the district court.  28 U.S.C. § 158(d)(2).  For such appeal, we review the bankruptcy court's factual findings for clear error and legal conclusions *de novo*.  *Matter of Linn Energy, L.L.C.*, 936 F.3d 334, 340 (5th Cir. 2019).

## II.

We first address the cross-appeal on the "disbursements" question.  Recall that Buffets contends disbursements should be limited to bankruptcy-related expenses like paying creditors and priority and administrative expense claims.  If it is correct, then it did not have $1 million in quarterly disbursements, and its constitutional concerns with the fee increase go away.  So we must first consider this possible statutory resolution of the dispute.  *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (explaining that principles of restraint direct a court to first address a statutory question when it may eliminate a constitutional issue).

But the disbursement issue does not end this appeal, as the bankruptcy court correctly concluded that disbursements include all of Buffets' payments, including operating expenses.  The bankruptcy code does not define "disbursements," so we look to its ordinary meaning.  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011).  A disbursement is money paid out.  *Disbursement*, MERRIAM-WEBSTER DICTIONARY (2016).  The plain meaning would thus include all payments made by a debtor, not just "bankruptcy-related" expenses.

Another stumbling block for Buffets' argument is that it would give "disbursements" a different meaning before and after confirmation.  Buffets

concedes that when section 1930(a)(6) first tied fees to disbursements, those disbursements included all payments the debtor made. § 117, 100 Stat. at 3095. That is because the fees originally applied only preconfirmation, during which all payments—including operating expenses—are dispersed from the bankruptcy estate. Ten years later, Congress extended the quarterly fees to include postconfirmation disbursements. In doing so, it did not suggest a different treatment for postconfirmation disbursements. There is a strong presumption against giving a word "two different meanings" when it appears twice "in the same section of the statute." *See Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (Stevens, J.); *see also Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) (noting that "a single use of a statutory phrase must [typically] have a fixed meaning"). Buffets wants us to do something even more drastic: give the exact same word in a statute different meanings depending on the context in which it is applied. Doing so would defy congressional intent and foster confusion.

Slashing a debtor's operating expenses from disbursements only in postconfirmation calculations would also create a circuit split, at odds with the emphasis on uniformity that Buffets otherwise emphasizes. *See In re Westmoreland Coal Co.*, 968 F.3d 526, 532 (5th Cir. 2020) (explaining that our normal reluctance to create circuit splits is even stronger for bankruptcy law). Several circuits define "disbursements" as "all payments by or on behalf of the debtor." *In re Cranberry Growers Coop.*, 930 F.3d 844, 853 (7th Cir. 2019); *In re Genesis Health Ventures, Inc.*, 402 F.3d 416, 422 (3d Cir. 2005) (including post-filing operational expenses); *cf. In re Jamko, Inc.*, 240 F.3d 1312, 1313, 1315 (11th Cir. 2001) (defining disbursements as "all post-confirmation disbursements made by a reorganized debtor," including operating expenses). Another expressly includes postconfirmation operating expenses as "disbursements." *In re Danny's Mkts., Inc.*, 266 F.3d 523, 526 (6th Cir. 2001); *see also* COLLIER ON BANKRUPTCY ¶ 9.06[2] (Richard

No. 19-50765

Levin & Henry J. Sommer eds., 16th ed. 2020) (stating that disbursements include "all expenses paid by a debtor," even postconfirmation operating expenses). *But see In re Brown*, 2008 WL 899333, at \*4 (Bankr. S.D. Tex. Mar. 31, 2008).

We thus agree with the bankruptcy court and our sister circuits that "disbursements" includes all payments a debtor makes.

## III.

Because "disbursements" include all the payments Buffets made in 2018, its roughly $60 million of quarterly disbursements qualify for the heightened fees. We must therefore answer the first certified question: Does the Amendment apply to cases like Buffets' that were pending when the Amendment took effect? The statute gives a straightforward answer: yes.

## A.

The Amendment applies to every "quarter in which disbursements equal or exceed $1,000,000" for "fiscal years 2018 through 2022" when the U.S. Trustee System Fund falls below the set amount. 28 U.S.C. § 1930(a)(6)(B). Removing any doubt, the 2017 Amendment states that the fee increases apply to "disbursements made in any calendar quarter that begins on or after" the Act's enactment date of October 26, 2017. § 1004(c), 131 Stat. at 1232. The applicability of the new fee thus turns on when debtors make disbursements, not when their cases are filed or confirmed. *E.g.*, *In re Exide Techs.*, 611 B.R. 21, 26 (Bankr. D. Del. 2020).

It is not surprising that Congress applied the latest fee increase to disbursements made after the Amendment's effective date even if the cases were previously pending. Congress did the same for prior amendments to section 1930(a)(6). In 1996, Congress extended the law to require debtors to pay quarterly fees beyond confirmation up until their cases were dismissed or

No. 19-50765

converted. *Id.* at 29. Courts soon disagreed about whether the amendment applied to cases in which plans had been confirmed before the amendment's enactment. Congress quickly resolved the dispute, passing legislation later that same year clarifying that the amendment applied to debtors whose plans were confirmed before or after the amendment took effect. *In re Life Partners Holdings, Inc.*, 606 B.R. 277, 284–85 (Bankr. N.D. Tex. 2019) (citing Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, § 109(d), 110 Stat. 3009, 3009–19 (1996)). Since then, Congress has amended the fee amounts in section 1930(a)(6) several times, and "it appears no one [has] argued the changes did not apply to pending cases."[4] *Clayton*, 2020 Bankr. LEXIS 842, at *13. In making its most recent change to the quarterly fees, Congress operated under this widespread understanding that fee increases apply to postenactment disbursements in pending cases. *Manhattan Props., Inc. v. Irving Trust Co.*, 291 U.S. 320, 336 (1934) (following longstanding lower court interpretations of a Bankruptcy Act provision because it had been amended numerous times without a statutory change to the construction courts had given it).

The statutory history therefore confirms what the text says—new disbursements, not new cases, trigger the higher fees.[5]

---

[4] Buffets did not make that argument in the bankruptcy court; the court took that view on its own.

[5] Congress did more in the 2018 Amendment than update the quarterly fee schedule. It also made changes to Chapter 12, the section of the Bankruptcy Code that allows farmers to reorganize. Those amendments expressly apply only to (1) new cases and (2) pending cases with no confirmed plans and discharge orders. § 1005(c), 131 Stat. at 1234. That, Buffets argues, shows Congress would have said the same if it wanted the quarterly fees to apply to pending cases. But we decline to draw that negative inference. *See Martin v. Hadix*, 527 U.S. 343, 356–57 (1999) (noting that "negative inference" arguments are weak when legislation addresses different subjects). The Chapter 12 amendments do show that Congress can make legislation explicitly applicable to pending cases when necessary. But there is an extra element of "necessity" for the Chapter 12

No. 19-50765

B.

Buffets contends that applying the new fees in pending cases is impermissibly retroactive. Applying a new law to events occurring before it was enacted may give rise to due process concerns. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Retroactive application deprives parties of adequate notice and undermines "settled expectations." *Id.* at 265. As a result, there is a presumption against reading a statute in a way that raises those retroactivity concerns. *Id.*

But that presumption kicks in only when there is a possibility that the law "attaches new legal consequences to events completed before its enactment." *Id.* at 269–70. As Justice Story put it, a law is retroactive only if it "affect[s] vested rights and past transactions." *Society for the Propagation of the Gospel v. Wheeler*, 2 Gall. 105, 22 F. Cas. 756, 767 (No. 13,156) (C.C. N.H. 1814). The fee increase does neither. It applies only to future disbursements, which are triggered by a debtor's conduct—making payments—occurring after the law's effective date. *F.D.I.C. v. Faulkner*, 991 F.2d 262, 266 (1993) (noting that date of the conduct is the relevant inquiry).

That means the 2017 Amendment is prospective. It does not "impair rights" that debtors like Buffets had when they filed for bankruptcy or had their plans confirmed, "increase [their] liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. Of course, the Amendment increases the amount of quarterly

changes that does not exist with the quarterly fee statute. The Chapter 12 legislation added a new section to the Code that expanded the scope of Chapter 12 discharge. *See In re MF Global Holdings Ltd.*, 615 B.R. 415, 430 (Bankr. S.D.N.Y. 2020). Congress had a need, then, to clarify that the amendments did not apply to cases with preexisting discharge orders to preserve parties' vested rights. Such clarification is not needed for yet another change to the more-than-two-decade-old quarterly fee statute. *Id.*

fees that large Chapter 11 debtors anticipated paying, but they always expected to pay some of those fees. The mere upsetting of their expectations as to amounts owed based on *future* distributions does not make for a retroactive application. *Id.* at 269–70. Nor does it encumber vested property rights under confirmed plans, *see* 11 U.S.C. § 1141, as some degree of "variability in the final amount available to plan distributees" is expected in complex bankruptcies. *In re CF & I Fabricators of Ut., Inc.*, 150 F.3d 1233, 1239 (10th Cir. 1998).

Most bankruptcy courts agree. *In re John Q. Hammons Fall 2006*, 2020 Bankr. LEXIS 2116, at *17–18 (Bankr. D. Kan. July 27, 2020) (sixth court to agree). They consider the Amendment "more akin to taxes arising post[-]confirmation, or any similar post-confirmation expenses," which are not retroactive even though changes in those expenses may disrupt the debtor's expectations. *In re Circuit City Stores, Inc.*, 606 B.R. 260, 268–69 (Bankr. E.D. Va. 2019) (quotations omitted). The only two courts that have disagreed sidestepped the threshold retroactivity question: Do the Amendment's negative effects on debtors stem from "events completed before its enactment"? *Landgraf*, 511 U.S. at 270; *see Life Partners*, 606 B.R. at 285 (adopting *Buffets*' reasoning); *In re Buffets*, 597 B.R. 588, 596–97 (Bankr. W.D. Tex. 2019). Because the Amendment applies only to disbursements made after its enactment, the answer is no. Just as a homeowner must honor property tax laws enacted after she purchases a home, Buffets must abide by the statutory fee schedule enacted after the court confirmed its plan.[6] *See Landgraf*, 511 U.S. at 269 n.24 (describing a

---

[6] Even if the fee increase were to apply retroactively, it would not necessarily violate due process. *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1324–25 (2016). A retroactive law need only be "supported by a legitimate legislative purpose furthered by rational means." *United States. v. Carlton*, 512 U.S. 26, 30–31 (1994) (quotations omitted).

No. 19-50765

"new property tax or zoning regulation" as "uncontroversially prospective").

## IV.

Our conclusion that the 2017 Amendment is prospective brings us to the main event: whether its fee increase violates constitutional uniformity requirements.

The Constitution grants Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4.[7] The Bankruptcy Clause "might win" a "contest for least-studied part" of Article I's congressional powers. Stephen J. Lubben, *A New Understanding of the Bankruptcy Clause*, 64 CASE W. RES. L. REV. 319, 319 (2013). Although disputes over debtor-creditor relations were an impetus for the Constitutional Convention, the Bankruptcy Clause received "meager" attention in Philadelphia.[8] *Ry. Labor Execs. Ass'n v.*

---

[7] The bankruptcy court relied on a different part of the Constitution in concluding that that increased fees' lack of uniformity makes them unconstitutional. That different uniformity provision relates to taxes: Congress may "lay and collect [t]axes . . . ; but all Duties, Imposts, and Excises shall be uniform throughout the United States." U.S. CONST. art. I, § 8, cl. 1. Perhaps the confusion stemmed from the fact that this limit on the tax power is called the Uniformity Clause. *Circuit City*, 606 B.R. at 269. There is one other mention of uniformity in the Constitution. In the same clause where it grants Congress power to enact "uniform" bankruptcy laws, Article I grants Congress the power "To establish a uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4.

Despite the bankruptcy court's grounding its holding in the tax-based Uniformity Clause, on appeal both parties focus on the Bankruptcy Clause, as have most other bankruptcy courts that have considered challenges to the 2017 Amendment. *See, e.g.*, *Circuit City*, 606 B.R. at 269 (explaining that the different clauses depend on whether the increased Chapter 11 fees are deemed user fees or taxes). As we explain later, the increased fees are user fees, *see infra* pp. 19–20, which means they are not general taxes to which the Uniformity Clause applies.

[8] Near the end of the Convention, Charles Pinckney proposed the Bankruptcy Clause along with the Full Faith and Credit Clause. Judith Schenck Koffler, *The Bankruptcy*

*Gibbons*, 455 U.S. 457, 471 (1982). And the federal bankruptcy power is directly mentioned in only one of 85 essays that make up *The Federalist Papers*. Randolph J. Haines, *The Uniformity Power: Why Bankruptcy Is Different*, 77 Am. Bankr. L.J. 129, 169 (2003) (citing The Federalist No. 42, at 217 (James Madison)). Even then, Madison mentions the Bankruptcy Clause briefly and notes that "the expediency of it seems not likely to be drawn into question." *Id.*

Paradoxically, the uncontroversial nature of the Bankruptcy Clause at its inception has led to uncertainty about its meaning today. *See, e.g.,* Lubben, *supra*, at 319 (rejecting courts' assumptions that the Bankruptcy Court is "the bankruptcy counterpart to the much better-known Commerce Clause"). Uniformity in particular "has defied principled interpretation since its adoption and continues to be a source of analytical confusion." Koffler, *supra*, at 22; *see also* Haines, *supra*, at 165–72 (arguing against the view that uniformity is a limitation); Note, *Reviving the Uniformity Requirement*, 96 Harv. L. Rev. 71, 73–75 (1982) (discussing different possible meanings of uniformity).

The Trustee says we do not have to delve into the uniformity morass. He contends that the fee statute is not a law "on the subject of Bankruptcies."[9] It is akin, in his view, to the different local bankruptcy rules that districts apply or the Bankruptcy Appellate Panels that only some

---

*Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. Rev. 22, 35–36 (1983) (citing 2 The Records of the Federal Convention of 1787, at 447 (M. Farrand ed. 1911)). Roger Sherman raised the only doubt about the Bankruptcy Clause, expressing concern because "in England, some bankrupts were sentenced to death." *Id.* (citing 2 The Records of the Federal Convention of 1787, at 489).

[9] Of course, that means there must be some other constitutional source for the fee statute. The Trustee says it is a lawful exercise of the Necessary and Proper Clause.

circuits use. And no court has held that those differences in bankruptcy procedure present a uniformity problem. But every bankruptcy court dealing with a challenge to the 2017 Amendment has rejected the analogy. *E.g.*, *Clayton*, 2020 Bankr. LEXIS 842, at *20–21. Some note that the statue governs only bankruptcy cases, though the same could be said for Bankruptcy Appellate Panels. *Id.* More persuasive is the point that, unlike the varying procedures that only indirectly might lead to different outcomes, the fee increase has a direct effect on what creditors receive—less than before. *Life Partners*, 606 B.R. at 288 (explaining that because fees have administrative-claim status in bankruptcies, increases in charged fees decrease distributions to "lower-priority creditors"). The subject of bankruptcies, after all, is "nothing less than the subject of the relations between an insolvent or nonpaying or fraudulent debtor, and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14 (1938) (quotations omitted).

The consensus view of bankruptcy courts that Chapter 11 fees are Bankruptcy Clause legislation is likely correct. But we need not decide the question because, even assuming it is, we find no uniformity problem.

Although the Supreme Court has treated the uniformity requirement as a limit on congressional power, it has also recognized that it "is not a straightjacket that forbids Congress to distinguish among classes of debtors." *Gibbons*, 455 U.S. at 469. Nor does it bar every law that allows for a different outcome depending on where a bankruptcy is filed. *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918). Bankruptcy laws that use state law to decide which property is exempt from creditors, often an issue of great consequence, are permissible. *Id; Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 188 (1902). So was a Depression-era law that established a three-year stay for certain foreclosures but allowed bankruptcy courts to lift the stay sooner based on

economic conditions "in its locality." *Wright v. Vinton Branch of Mountain Tr. Bank*, 300 U.S. 440, 463 & n.7 (1937).

As a result of the "flexibility inherent in the constitutional provision," *Reg'l R.R. Reorganization Act Cases*, 419 U.S. 102, 158 (1974), only once has the Supreme Court held that a bankruptcy law failed for lack of uniformity. *Gibbons*, 455 U.S. at 473. The infirm law applied only to one debtor, making it essentially a bill of attainder. *Id.*

Aside from prohibiting such "private bankruptcy bills," which does not describe the fee increase, the uniformity requirement forbids only "arbitrary regional differences in the provisions of the Bankruptcy Code." *In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (Posner, C.J.). Buffets relies on this concept of "geographic uniformity." *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172 (1946) (Frankfurter, J., concurring); *see also Moyses*, 186 U.S. at 188. Its problem is that only "arbitrary" geographic differences are unconstitutional. *Reese*, 91 F.3d at 39. "The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." *Reg'l R.R. Reorganization Act Cases*, 419 U.S. at 159. Indeed, the Supreme Court has never held that a law violated the Bankruptcy Clause because of arbitrary geographic distinctions. It allowed Congress to set up a special court and laws for bankrupt railroads in the northeast and midwest, as those were the only parts of the country with the problem. *See id.*; *see generally* John Minor Wisdom, *Views of a Friendly Observer*, 133 U. PA. L. REV. 63 (1984) (discussing his service on the Special Railroad Court with Judge Friendly).

Just as it did in addressing the failure of railroads in the industrial heartland, Congress confronted the problem of an underfunded Trustee Program where it found it: in the Trustee districts. It drew a program-specific

distinction that only indirectly has a geographic dimension. It does make it more expensive for a debtor in Texas than a debtor in North Carolina to go through bankruptcy, but that is not an arbitrary distinction based on the residence of the debtor or creditors; it is a product of the Texas debtor's use of the Trustee. By increasing fees for large debtors in those districts, Congress sought to remedy a shortfall in the program's funding. Only debtors in Trustee Districts use trustees, so Congress could "solve 'the evil to be remedied'" with a fee increase in just the underfunded districts. *Reg'l R.R. Reorganization Act Cases*, 419 U.S. at 160–61.[10]

A quarter century ago, the Ninth Circuit concluded that the establishment of Trustee and Administrator Districts was an "irrational and arbitrary" distinction for which Congress gave "no justification."[11] *See St. Angelo*, 38 F.3d at 1532. In the recent temporary fee increase for large Chapter 11 debtors, Congress provided that justification: a need to ensure

---

[10] The Trustee contends there is not a uniformity problem for another reason: The fee increase could have automatically applied in the six Non-Trustee Districts from the beginning. But that ignores that section 1930(a)(7) says the Judicial Conference "*may* require" Chapter 11 debtors in Administrator districts "to pay fees equal to those imposed" in Trustee districts. 28 U.S.C. § 1930(a)(7) (emphasis added). So while the Trustee is correct that our analysis should focus on what Congress has passed rather than how the law is later administered, Congress required the new fees in the Trustee Districts but only allowed for their possibility in the Administrator Districts. The Judicial Conference's delayed implementation of the fee increase highlights the difference between "may" and "shall." *But see Clinton Nurseries*, 608 B.R. at 114–17 (accepting the Trustee's argument on this point).

[11] The dissent contends that the justification asserted in *St. Angelo* was the same one asserted here: the need to provide "different fees because different programs." Dissenting Op. 3. But the focus in *St. Angelo* was on the underlying creating of the two programs. Without a funding shortfall, there would be no apparent justification for higher fees in one of the programs. That shortfall exists now. The 2017 statutory amendment is not a law in which "Congress failed to provide an explanation for its decision." *St. Angelo*, 38 F.3d at 1532.

No. 19-50765

that the Trustee Program remains funded by users of the bankruptcy court rather than taxpayers. That justification passes constitutional muster.[12]

The partial dissent cannot dispute the government's interest in replenishing the depleted coffers of the Trustee program. So it focuses on the rationale, or lack thereof, for creating separate systems in the first place. It concludes that nothing more than "political influence" resulted in the dual systems. Dissenting Op. 5. Maybe so, but that is answering a question we are not being asked (and thus did not receive briefing about). The Plaintiffs do not ask us to "hold that the permanent division of the country into UST districts and BA districts violates the Bankruptcy Clause." [13] *Id.* Our normal

---

[12] Again, most bankruptcy courts addressing the issue agree. On the uniformity question, the score is 5-3 in favor of constitutionality. *Compare John Q. Hammons Fall 2006*, 2020 Bankr. LEXIS 2116, at *19–23 (uniform); *MF Global*, 615 B.R. at 446–48 (same); *Mosaic*, 614 B.R. at 623–25 (same but excepting 2%); *Clayton*, 2020 Bankr. LEXIS 842, at *27 (same); *and Exide*, 611 B.R. at 36–38 (same), *with Life Partners*, 606 B.R. at 286–88 (non-uniform); *Circuit City*, 606 B.R. at 269–70 (same); *and Buffets*, 597 B.R. at 594–95 (same).

[13] Unlike this case, the debtor in *St. Angelo* was challenging the creation of the separate systems. 38 F.3d at 1529. In particular, the court held unconstitutional a 1990 law extending to October 1, 2002 the deadline for North Carolina and Alabama to join the Trustee program. *Id.* at 1531–32. In holding the 1990 extension unconstitutional, Judge Reinhardt's opinion would have subjected those two states to the Trustee Program. *Id.* at 1533, 1535. Because its remedy was to bring North Carolina and Alabama into the Trustee system, the Ninth Circuit actually applied the fees that Congress established for the Trustee Program. *Id.* at 1535.

While otherwise purporting to follow *St. Angelo*, the dissent assumes the remedy for a lack of uniformity would be to remove the new fees in Trustee Districts. But if the problem is the existence of the two systems, why not follow the *St. Angelo*'s remedy of bringing North Carolina and Alabama into the Trustee System? The trustee makes a similar argument here, contending that if there is a uniformity problem, then the remedy should be to immediately apply the increased fees in all districts. Trustee's Br. 30 (citing *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017). We need not decide what a proper remedy would be because we find no constitutional violation. We only note the potential disconnect between the infirmity the dissent finds and the remedy Buffets seeks.

No. 19-50765

reluctance to hold unconstitutional a decades-old feature of federal bankruptcy law should grow into a refusal when no party is asking us to do so.[14] *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (recognizing that "judging the constitutionality of an Act of Congress is 'the gravest and most delicate duty" that federal courts are asked to perform) (quoting *Blodgett v. Holden*, 275 U.S. 142, 147–48 (1927) (Holmes, J., concurring))).

The issue presented to us is much narrower: whether a recent, short-term change in fees for Trustee districts is unconstitutional because it lacks a reasonable justification. As one bankruptcy court explained, "The Plainitffs do not challenge the dual UST/BA system as unconstitutional, and as long as the two regimes co-exist, they will face funding problems that may be unique to only one of them." *MF Global Holdings*, 615 B.R. at 447–48. It is reasonable for Congress to have those who benefit from the Trustee Program fill the hole in its finances.[15]

---

[14] The partial dissent argues that we are viewing Buffets' argument too narrowly as just a challenge to the 2017 fee increase. Dissenting Op. 4. But the proof is in the briefing. Neither side addresses the decision more than three decades ago to create two separate systems. Nor was the original 1986 law addressed in the bankruptcy court decision in this case or in the seven other bankruptcy court rulings deciding a uniformity challenge to the 2017 fee increase. *See supra* note 12. As the parties have not litigated the question, we should not decide the case on a question that did not benefit from the adversarial process— especially when the dissent's view would undo a longstanding feature of bankruptcy practice.

[15] What about the 2% of the new fees that goes to the Treasury's general fund rather than the Trustee Program? *See In re Mosaic Mgmt. Grp., Inc.*, 614 B.R. 615, 623–25 (Bankr. S.D. Fla. 2020) (distinguishing the 2% as non-uniform). That small amount primarily funds 18 new judgeships, 17 of which are in Trustee Districts. *MF Global*, 615 B.R. at 448; *see* H.R. Rep. No. 115-130, at 7–9. The "de minimis" amount that Trustee District debtors contribute to funding one Administrator District judge (at most, $278 per $250,000) does not render the law unconstitutional given the "flexibility inherent" in the uniformity

No. 19-50765

V.

Buffets' final arguments challenge not the uniformity of the new fees but their size and relationship to the funding shortfall. These arguments would mean the new fees are unconstitutional even after both Trustee and Administrator districts apply them.

A.

Buffets appears to raise a due process challenge to the excessiveness of the new fee separate from its already-rejected retroactive argument. Buffets recognizes the law must lack a rational basis to offend substantive due process. The difficulty of doing that is revealed by Buffet's reliance on cases that have retroactive application, *see United States v. Sperry Corp.*, 493 U.S. 52, 64 (1989), or even that apply the Export Clause, which requires heightened scrutiny of user fees, *see United States v. U.S. Shoe Corp.*, 523 U.S. 360, 367–69 (1998). It cites no case refusing to enforce a court fee as excessive under a general substantive due process analysis.

The fee increase easily survives rational basis review. It addresses a shortfall in the U.S. Trustee System Fund. The fee increase is directly tied to the deficit, kicking in only if the balance is below $200 million and expiring by 2022. It is reasonable to have large debtors shore up the system's finances as their cases typically place greater burdens on the system. *In re Kindred Healthcare, Inc.*, 2003 Bankr. LEXIS 1308, at *13–14 (Bankr. D. Del. Oct. 9, 2003). And the increase caps the fees at 1% of disbursements,[16] which is a much lower percentage than some small debtors pay. *See* 28 U.S.C.

---

provision. *Reg'l R.R. Reorganization Act Cases*, 419 U.S. at 158; *see MF Global*, 615 B.R. at 443,448.

[16] Buffets did not pay close to the 1% as it paid the $250,000 cap, which amounted in the first quarter of 2018 to less than half a percent of disbursements.

§ 1930(a)(6)(A) (setting fees of $650 when disbursements total $15,000, a 4.33% fee).

## B.

Similar reasoning defeats the takings claim. Taxes and user fees are not takings under the Fifth Amendment. *Koontz v. St. John's River Water Mgmt. Dist.*, 570 U.S. 595, 615 (quoting *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 243 n.2 (Scalia, J., dissenting)). Those exceptions cannot swallow the important rule that the government must pay just compensation when it appropriates property, so the "fee" label is not enough. *Sperry*, 493 U.S. at 62 & n.8 (noting that the government cannot appropriate property and then "label[] the booty as a user fee" (citing *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162–64 (1980) (holding that county's taking the interest earned on interpleader funds was a taking)). A user fee is not a taking when it is a "reasonable" amount "imposed for the reimbursement of the cost of government services." *Id.* at 63. That is what we have here.

For the fee increase to be reasonable, it just needs to be a "fair approximation of the cost of benefits supplied" to the debtors. *Id.* at 60 (quoting *Massachusetts v. United States*, 435 U.S. 444, 463 n.19 (1978)). It need not be "precisely calibrated" to the debtor's use of the Trustee Program. *See id.* An exact calibration would be an administrative nightmare given the number of debtors using the system.

Acknowledging that reality, the Supreme Court has allowed percentage-based fees to serve as a proxy for how much a party uses the service. *See id.* at 62 (approving 1.5% fee of awards made by the Iran–United States Tribunal in exchange for the Tribunal's services); *see also Massachusetts*, 435 U.S. at 468 (approving certain cent-per-gallon fees on aircraft expenses). An expected—and accepted—byproduct of this system is that debtors like Buffets may pay "more or less than [they] would under a

No. 19-50765

perfect user-fee system." *Sperry*, 493 U.S. at 61. Debtors' actual use of the program therefore need not drive the fees; the program's availability for their use is enough.[17] *Id.* at 63–64.

How much is too much when it comes to user fees? One reference point is *Sperry*, in which the Court approved a 1.5% fee on awards for a party's use of the Iran–United States Claims Tribunal. *See id.* at 62–64. There is no indication that 1.5% is near the outer reaches of reasonableness, but we need not explore the question further. Section 1930(a)(6)'s fee schedule maxes out at 1% for the largest Chapter 11 debtors.

Other features of the 2017 Amendment strongly refute the notion that it is a taking masquerading as a user fee. The fee increase lasts for only a few years, and even during that short tenure applies only when the fund falls below $200 million. That trigger ties the fee to the availability of the services it is supporting.

Buffets counters that 2% of the fees go to the Treasury's general fund and the higher fees as a whole create a "surplus" in the U.S. Trustee System Fund. Thus, in its eyes, the user fees are not related to the services debtors receive. But as we discussed earlier, just about all of the money from the fees going to the general fund support court services in Trustee districts (in the form of new judges). And even if the statute creates a "surplus" in the Fund, the government may offset user-fee revenue "surplus" in one year "against actual deficits of past years and perhaps against projected deficits of future years." *Massachusetts*, 435 U.S. at 470 n.25.

---

[17] This dooms Buffets' argument that its diminished use of the Trustee Program postconfirmation makes the user fee excessive. The argument reflects disagreement with the 1996 amendment to section 1930, which extended the application of quarterly fees to postconfirmation cases. *Exide*, 611 B.R. at 32.

No. 19-50765

Fees that strengthen the program debtors benefit from are not takings.[18]

\* \* \*

Buffets' had disbursements exceeding $1 million for each of the first three 2018 quarters. The fee increase applies to those disbursements even though the case was pending before the increase became law. And the fee increase is constitutional. We therefore REVERSE the judgment and remand for modification of the fee orders.

---

[18] *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), on which Buffets relies, does not counsel otherwise. That case held that provisions of the Coal Act requiring employers to fund the health benefits of retired miners were a regulatory taking. *Id.* at 522–38. The *Eastern Enterprises* law looked nothing like a user fee. The government did not even make that argument as the amounts the mining company owed were not tied to any government services the company was receiving.

No. 19-50765

Edith Brown Clement, *Circuit Judge*, concurring in part and dissenting in part:

The Constitution authorizes Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8. We currently have two systems, one of which is more expensive than the other, and the sole factor that determines into which system a debtor is placed is the state in which the debtor files for bankruptcy. Those two systems are not a uniform law on the subject of bankruptcies, so I respectfully dissent from Part IV of the opinion. I concur, however, with Parts I, II, III, and V.

The Bankruptcy Clause permits wide flexibility. The Supreme Court has explained that the "uniformity requirement of the Bankruptcy Clause is not an Equal Protection Clause for bankrupts." Ry. Lab. Execs. Ass'n v. Gibbons, 455 U.S. 457, 470 n.11 (1982). Indeed, as our colleagues on the Seventh Circuit explained, it "forbids only two things. The first is arbitrary regional differences in the provisions of the bankruptcy code. The second is private bankruptcy bills . . . or the equivalent." In re Reese, 91 F.3d 37, 39 (7th Cir. 1996).

The majority explains that the difference between the fees charged to Buffets and the lower fees that an identically situated debtor in Alabama or North Carolina would be required to pay is adequately explained by the different programs that administer bankruptcies in this country. In two states, the Bankruptcy Administrator ("BA") program oversees bankruptcies; in the other forty-eight, the United States Trustee ("UST") Program is used. If there is a shortfall in the UST Program fund, the majority reasons, it's not arbitrary or irrational to increase fees only in UST districts.

25

No. 19-50765

However, the majority's analysis ends too soon. The majority explains that the higher fees for "a debtor in Texas" are "a product of the Texas debtor's use of the Trustee," but fails to address why the Texas debtor is required to use the Trustee in the first place, when Alabama and North Carolina debtors get to use less-expensive Administrators. In other words, the opinion relies on a flawed tautology: Congress can justify treating bankrupts differently because it has chosen to treat them differently (higher fees because different programs).

To address the question: the sole reason states are treated differently is regional political influence (of course). The UST Program was originally intended to be a uniform, nationwide program, but "well[-]connected and motivated trustees and judges" convinced North Carolina's senators to resist expanding the UST Program.  Because the program was phased in, Congress could easily put the states that were most resistant—Alabama and North Carolina—at the end of the line. When they continued to resist, they were given extensions to adopt the UST Program. Eventually, a North Carolina congressman tucked a permanent exemption from the UST Program into an unrelated bill during the November 2000 lame duck session.  Nothing about North Carolina or Alabama distinguishes them from any other states in terms of whether BA or UST is a better fit—the distinction is an arbitrary political relic.

Grouping debtors into UST and BA districts is itself an arbitrary regional difference. It results in Buffets' being required to pay substantially higher fees to the trustee overseeing its bankruptcy than an otherwise identically situated debtor in North Carolina or Alabama would.

Our colleagues on the Ninth Circuit correctly identified this constitutional infirmity in St. Angelo v. Victoria Farms, Inc., 38 F.3d 1525, 1533 (9th Cir. 1994), amended by 46 F.3d 969 (9th Cir. 1995). The majority

26

distinguishes St. Angelo by mischaracterizing the problem in that case as a "differing fee structure . . . for which Congress gave 'no justification.'" Here, the majority avers, Congress's justification is that it needed to fund a different program differently.

First, the majority is factually mistaken. The same justification (different fees because different programs) existed in St. Angelo. Second, if the constitutional infirmity was unexplained unequal fees, the Ninth Circuit could have simply required equal fees (by reducing the fees owed by the litigant before them). They didn't do that.

The St. Angelo court's purported solution did not directly touch on fees at all. The court expressly "decline[d] to invalidate all of section 1930 [the section addressing fees] or any other part of the statutory scheme governing the U.S. Trustee system." St. Angelo, 38 F.3d at 1533. Instead, the Ninth Circuit held that the "constitutional infirmity in question may be remedied by simply striking down section 317(a) [of the Judicial Improvements Act of 1990]." Id. Section 317(a)—"the basis for the existence today of a different statutory scheme governing the relationship between debtors and creditors in Alabama and North Carolina"—was solely an extension of the deadline for Alabama and North Carolina to join the UST system. Id. Striking down Section 317(a) could have had no other effect than to force North Carolina and Alabama into the UST system, only indirectly affecting fees in those states. In short, the constitutional infirmity that the Ninth Circuit identified and sought to correct was not dissimilar fees, but the arbitrary use of two dissimilar systems.

Congress may have removed the harm to debtors by equalizing fees after St. Angelo, but it did not fix the underlying constitutional infirmity of a dis-uniform law on the subject of bankruptcies. Now that the Judicial

No. 19-50765

Conference has chosen to treat debtors in BA districts better than Congress chose to treat UST district debtors, the problem is once again causing harm.

The majority questions why I would grant the remedy Buffets seeks—reducing its fees—rather than impose the remedy the St. Angelo court offered. That the question can even be asked should also answer it: The St. Angelo court had no power to force Alabama and North Carolina into the UST system, which is why the constitutional infirmity persists and we are having this debate today. We have no greater authority than our colleagues on the Ninth Circuit to remake the bankruptcy system. What we can do is ameliorate the harm of unconstitutional treatment. So, we should.

This may also explain how the majority is able to mistake Buffets's argument as a narrow challenge to the fee structure with no bearing on the underlying dis-uniform systems. Buffets, understandably, focuses on how the unconstitutional system hurts it—the system results in Buffets being charged higher fees. That is, Buffets focuses on the harm more than it does on the underlying infirmity.

But I fear the majority relies on an excessively uncharitable reading of Buffets's arguments to escape the constitutional question. That Buffets relies heavily on St. Angelo tells us that they challenge the structure of the law, and not just the effects. Buffets clearly challenged "the statute, as amended" for failing to satisfy constitutional standards, Buffets Br. at 7, and ably explained that the problem stemmed from the interplay between the two systems, see Buffets Br. at 28 ("Sections 1930(a)(6)(B) and 1930(a)(7) impose different standards based on geography, and are, by their terms, non-uniform."); id. at 31–32 (arguing based on overall unconstitutional structure of the statute); Buffets Sur-Reply at 16 ("Simply put, Congress cannot create a geographically isolated problem by implementing a more costly bankruptcy system in certain parts of the country, and then claim the

28

Constitution allows it to exact higher fees from debtors in the applicable geographic area." (citing St. Angelo, 38 F.3d 1525). The Government also fully briefed its position on the scope of "uniformity" in the Bankruptcy Clause (effectively: none) and whether two systems were constitutionally acceptable. To say that the harm alone was briefed, but the cause of the harm was not, requires an unreasonably narrow reading. Where prudent, we should avoid constitutional questions; but we should not actively avert our eyes where, as here, a party asks us to rectify a harmful constitutional violation.

For no better reason than political influence, debtors in two states enjoy a system subject to lower fees than those in the other forty-eight states. "This is the type of 'regionalism' the Uniformity Clause was intended to prevent." In re Circuit City Stores, Inc., 606 B.R. 260, 270 (Bankr. E.D. Va. 2019); see also Dan J. Schulman, The Constitution, Interest Groups, and the Requirements of Uniformity: The United States Trustee and The Bankruptcy Administrator Programs, 74 Neb. L. Rev. 91, 103 (1995) ("Uniformity, however defined, can be seen as an attempt . . . to prevent the federal government from acting or being employed to harm or advantage one region over another region."). Two laws are not a uniform law, so I would hold that the permanent division of the country into UST districts and BA districts violates the Bankruptcy Clause and would order Buffets to pay the lower fee.

Although I respectfully dissent from the majority's analysis of the uniformity issue in Part IV, I concur with the majority's analysis of the other important issues raised in this appeal, including the scope of the term "disbursements," how best to read 28 U.S.C. § 1930(a)(6)(B), and Buffets's retroactivity and takings arguments in Parts I, II, III, and V.